UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**KENNETH GRAYSON,**<br><br>**Defendant.** | **Case No. 21-cr-224-TSC** |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kenneth Grayson to 3 months' incarceration, a sentence in the middle of the 0 to 6 month sentencing guideline range as calculated by the Probation Office and agreed upon by the parties, three years of supervised release, and $2,000 in restitution.

## I. INTRODUCTION

The defendant, Kenneth Grayson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.8 million in losses.[1]

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

In the weeks leading up to the January 6, 2021 riot at the Capitol, Grayson made numerous posts about the 2020 election results. Among these, in December 2020, he posted about his plans to “STORM THE FUKIN CAPITAL” (*sic*) if requested by then-President Trump. On January 5, 2021, he rented a van, reserved a hotel suite, and drove several associates, including Jennifer Heinl, from Pennsylvania to Washington, D.C. to protest the results of the 2020 Presidential election.[2] On January 6, 2021, he, along with his associates, walked from the Washington Monument to the Capitol and while en route, he heard about the Capitol having been breached. He later entered the Capitol via the Senate Wing Doors approximately seven minutes after the initial breach of that area. Grayson eventually traveled to the Rotunda where he twice joined a group of rioters attempting to push past a line of officers. After being inside the Capitol for approximately 47 minutes, Grayson left the Capitol alongside Heinl.

The government recommends that the Court sentence Grayson to 3 months’ incarceration, three years of supervised release, and $2,000 in restitution

## II. FACTUAL BACKGROUND

### A. The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Grayson among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and

[2] On November 2, 2021, Jennifer Heinl pleaded guilty to violating 40 U.S.C. §5104(e)(2)(G) under docket 21-CR-370 (EGS). On June 8, 2022, Heinl was sentenced to 14 days’ incarceration, two years’ probation, $500 in restitution, and 50 hours of community service.

stealing artwork, furniture, and other property.  Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Grayson's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building of the crowd did not submit to standard security screenings or weapons checks by security officials.  The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their

way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 12-18.

***Injuries and Property Damage Caused by the January 6, 2021 Attack***

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing

those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.CapitolAttack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24,

2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than $2.8 million.

**B. Defendant's Role in the January 6, 2021 Attack on the Capitol**

***Grayson's Activities in the Months Leading up to January 6, 2021***

January 2021 was not the first time Grayson traveled to Washington, D.C. to protest the 2020 Presidential election. He had traveled to Washington, DC twice in the fall of 2020, a few weeks apart from each other. For example, on November 14, 2020, Grayson attended a protest of the Presidential election in Washington, D.C. and posted to Facebook, including videos, during his day in the nation's capitol. In one post, he stated, "some sit on the couch talk shit and judge and don't stand for shit some get on the front line… I know where I stand…with the million others here..AND FUCK ANTIFA[.]" On November 16, 2020, after someone asked him on Facebook if he got to mess up anyone [at the November 14, 2020 protest], Grayson replied that he had "beat[en] commies with a flag pole" and "left one unconscious":

**Author** Kenny Grayson (Facebook: 100006825195181)
**Sent** 2020-11-16 14:07:42 UTC
**Body** We were smashing bro..went to the van I rented and geared up..had to leave at 7pm though, it wasn't really bad yet..I was beating commies with a flag pole I picked up and looked like it wasn't going to be that bad Proud Boys were everywhere..cops weren't doing a fukin thing watching old people get fucked with it was sickening

**Author** Kenny Grayson (Facebook: 100006825195181)
**Sent** 2020-11-16 14:08:26 UTC
**Body** I left one unconscious so I did my little part and got the fuck out before I got arrested

*Grayson's Facebook message.*[3]

[3] The FBI does not have any information, other than Grayson's statement, that Grayson actually

In the weeks leading up to January 6, 2021, Grayson told others on Facebook about going to Washington, D.C. on January 6, 2021. For example, he sent the following image to a Facebook user on December 20, 2020.



On December 23, 2020, he told another Facebook user "Come to DC with me and [redacted] be part of history..it's the first time a potus has called directly to all Patriots to be there.. I'd walk there if I had to bro[.]" When the other user asked, "1/6?", Grayson replied, "Yes sir !!" and said that he had a "rental pimp van ready we arrive in DC around 430 ..check in the 2 bedroom suite with living room pullout that's a block from action ..eat, booze a little, and chill ..7am rally Wednesday morning.." When the other user responded that they were uncertain if they could go, Grayson responded "IM THERE IF TRUMP TELLS US TO STORM THE FUCKIN CAPITAL

---

assaulted anyone during the November 2020 protest.

IMA DO THAT THEN!":

**Author** Kenny Grayson (Facebook: 100006825195181)
**Sent** 2020-12-23 18:37:32 UTC
**Body** Ok well we have room for the road trip..I'm sick of these fukin posers on FB big tough guys always talking about their guns and tempers and ooo scary guy shit! FUCK U !! I'm on the front line every time mother fuckers! This shit isn't a fukin game to me , or some social media f[redacted]t story time !! I'm there for the greatest celebration of all time after Pence leads the Senate flip!! OR IM THERE IF TRUMP TELLS US TO STORM THE FUKIN CAPITAL IMA DO THAT THEN! We don't want any trouble but they are not going to steal this election that I guarantee bro!!

While planning for his trip to Washington, D.C., Grayson texted with an associate and stated that "we might be there doing street battle":

| | | | |
|---|---|---|---|
| | Sent | If the rally is 7am then we definitely have to be there the night before it will be one of the greatest nights of our lives | 12/21/2020 12:15:44 AM(UTC+0) |
| | Sent | We can dip out a little earlier on Wednesday then ..unless it's war lmao we might be there doing street battle lol I don't give af! Cops don't arrest ANYONE!! I was there you can smack people with asti k on the face and they look the other way | 12/21/2020 12:17:30 AM(UTC+0) |

During the above-described text exchange, Grayson also noted that he ordered "tactical riot gloves to wear and a sweet new hoodie." As he later discussed in his post-arrest interview and based on a review of his cellular telephone, in preparation for January 6, 2021, Grayson ordered a dark Gadsden hoodie and added a large yellow Q patch to the hoodie as well as an InfoWars patch. He also purchased tactical gloves, which he wore to the Capitol on January 6, 2021.

***Grayson's Activities on January 6, 2021***

On January 5, 2021, Grayson drove Heinl and two other associates to Washington, D.C. The following day, Grayson, dressed in dark sweatshirt with a yellow Q on his right chest and the

Gadsden snake on his left chest, and holding a yellow Gadsden snake flag while wearing tactical gloves, went to the Stop the Steal rally near the Washington Monument (depicted below).

Grayson and his associates attended the Stop the Steal rally at the Ellipse. Grayson told the FBI that he left when then-President Trump asked the protestors to go to the Capitol. While en route to the Capitol, Grayson heard rioters state, “they breached!” and Grayson recounted that he could hear flashbangs as he approached the Capitol.

While on the Capitol grounds, Grayson was in the midst of the mob of rioters on the West side of the Capitol. There, flashbangs were audible and tear gas was penetrating the air surrounding the mob of rioters. See Exhibit 1. Grayson also reported seeing officers enter the

area nearby and observed a physical altercation.



*Grayson, circled in red, on the West side of the Capitol. (Screenshot from Exhibit 1.)*

From there, Grayson went up the stairs and headed towards the courtyard in front of the Senate Wing Doors. Based on an open-source video,[4] Grayson stood outside momentarily, while looking down at his phone prior to walking towards the ramp leading up to the Senate Wing Doors.

There, he proceeded to hold up his cell phone and pan it around as though he was taking a video of the rioters in the courtyard while the breach was occurring.

*Grayson, circled in red, looking at his phone in courtyard in front of Senate Wing doors.*

[4] *Available at* https://www.youtube.com/watch?v=_E-6bRNfx2c. In this video, the area in front of the Senate Wing Doors is visible at the timestamp 21:40. Grayson is visible in the area just to the right of the center of the video between the timestamps 21:50 to 22:26. The videographer proceeded to walk closer towards the Senate Wing Doors and ultimately entered the U.S. Capitol, which has visibly shattered glass at the time stamp 23:20. Grayson is later visible in this video between timestamps 26:06-26:12, while filming and chanting "USA" in the Crypt.



*Grayson, circled in red, taking a photo and/or video of the Senate Wing doors.*

At approximately 2:13 p.m., the U.S. Capitol was first breached in this location, which is the entryway in the center of the above depiction, by a rioter who jumped through the window over the broken glass (depicted below).



At approximately 2:20 p.m., which is approximately 7 minutes after the above depicted breach, Grayson entered the U.S. Capitol via the Senate Wing Doors, which had embedded windows that were smashed by rioters.



*Grayson, circled in red, upon entering the U.S. Capitol.*

After entering the U.S. Capitol, he removed one glove with his mouth/teeth and then raised a phone overhead to film and/or photograph his path towards the Crypt.  Grayson then entered the Crypt, while dragging his Gadsden flag and raising his telephone in his left hand.



*Grayson, circled in red, upon entering the Crypt.*

While in the Crypt, Grayson proceeded to livestream the rioters swarming the Crypt and chanting "USA!"  See Exhibit 2.  The crowd swelled in the Crypt until they were able to overrun the officers and head towards the Memorial Doors and the stairwell leading up to the Rotunda. Grayson was in the Crypt at this time and more specifically within this mob.

At approximately 2:33 p.m., Grayson entered the Rotunda, where he later livestreamed from within.  While in the Rotunda, Grayson joined a crowd gathering in front of a row of officers who were protecting an archway that led to one end of House Speaker Pelosi's office suite.  The group surged forward towards the officers, and Grayson began pushing from the rear of the group. See Exhibit 3.



*Grayson, circled in red. (Screenshot of Exhibit 3 at 00:41 timestamp).*

While the crowd continued to surge towards the officers protecting that area of the Capitol, it appears that Grayson was pushed to the side of the crowd by the other rioters and then briefly stood by the wall. The videographer of Exhibit 3 appears to continue past Grayson and documented one rioter yelling "Let's go! Let's go" and another rioter yelling "Push! Push!" Grayson then appears to rejoin the group pushing the rioters towards the officers.

The crowd eventually dispersed, and Grayson can be seen leaving the area rubbing his face and eyes and coughing, possibly as a result of teargas exposure. See Exhibit 3, 2:13 timestamp. From there, Grayson ultimately left the Capitol via the Rotunda Doors with Heinl at approximately 3:07 p.m., after spending over 45 minutes inside the Capitol. Grayson then reunited with his other travel associates and returned to Pennsylvania.

***Grayson's Post Arrest Interview***

On January 26, 2021, Grayson participated in a post-arrest interview with the FBI. During this interview, he noted that he participated in to two post-election rallies in Washington, D.C. in

the fall of 2020. Discussing his participation in those rallies, he stated that he was not involved in violence but heard about the violence on TV. He claimed that the Proud Boys were protecting people and that he would only engage in violence to defend others. Grayson said that he consumed his information from online sources and noted that he follows the Q movement and InfoWars. However, he stated that the movements hate each other, which is why he put both an InfoWars and a Q patch on his hoodie.

When asked about January 6, 2021, Grayson stated that he took it "seriously" when "you get invited literally by the President to be somewhere." He was there because he felt like the election was stolen and he wanted to show support. Grayson said he felt as though he was doing something patriotic. He traveled with his associates on January 5, 2021 and attended the rally on January 6, 2021. Grayson said he saw groups of people starting to head out while they were watching then-President Trump at the rally. Grayson commented that the people who were leaving looked like they were on a mission.

Grayson stated that he started to walk towards the Capitol after then-President Trump said for everyone to go to the Capitol and he would meet them there. While Grayson was walking, he recalled people saying "they breached!" and he could hear flashbangs as he got closer to the Capitol. While Grayson and his associates were on Capitol grounds, they saw an altercation near the stairs by the Inaugural stage scaffolding. Grayson stated they wanted to get closer to the building to watch the "action" without getting involved. He recalled approximately twenty riot officers and people converged and "started going at it."[5] Grayson also stated that he was not going

[5] At the end of the interview, Grayson stated he did see people interacting with officers but did not see any fighting. However, during the interview, he appeared to be describing a violent clash on the West front between the newly arrived riot officers and the rioters, which occurred while he was

to get involved but was definitely going to watch since he was in a safe spot on top of a wall. Grayson stated that he observed antifa dropping tear gas and walking away. He also was tear gassed and even some of his associates were vomiting from the teargas. He eventually made it up to the "quad" (likely a reference to the courtyard in front of the Senate Wing Door). He commented on seeing an altercation at a doorway but said that he only observed the altercation. Grayson also said he felt like officers were just letting people in and out. He said there was no real resistance from the officers and it looked like they were just helping people. Grayson said he had no interactions with Capitol police and whenever he saw people doing "weird stuff," he just walked away.

During the interview, Grayson opined that "it wasn't a storming like people were describing. To me that wasn't a storming. I was watching them walk in." Grayson stated it was a "joke" to refer to the rioters' entry as a "storming." Grayson said that, while inside of the Capitol, he livestreamed. When asked why he livestreamed, he stated he wanted to share it on his social media and he felt as though he was being a patriot. Grayson stated he felt like it was time to leave because he noticed the police were beginning to change their attitude. So, he walked out of the Capitol. He later added that he left peacefully and did not touch anybody.

Grayson stated that if it was today, he would not even have walked near there (either a reference to the Capitol building or Capitol grounds). He also added that there were things that should never have happened and "they" should have had barriers up to keep people out. Grayson commented that if they had barriers around the Capitol, he would not have gotten 30 feet into the grounds. He also stated that he would never have gone inside the Capitol if there was something

---

present.

saying "you cannot come in."

Grayson stated the events on the Capitol grounds were the scariest part of the event, likening it to a street battle, and said that he felt safer inside the Capitol.  While Grayson referred to the event as horrible, traumatic, and "completely insane," he also said he wished he could have filmed it all.  A few times during the interview, he noted that "that was never the intention" of the day, meaning the rioters at the Capitol should not have been violent.  Grayson also stated, "I didn't take, rip, steal, touch, or fight… I only yelled and filmed and acted like an idiot."

## III.    THE CHARGES AND PLEA AGREEMENT

On March 17, 2021, a federal grand jury returned an indictment charging Grayson with Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).  On September 12, 2022, the United States Attorney for the District of Columbia filed a single count Superseding Information charging Grayson with Civil Disorder in violation of 18 U.S.C. §231(a)(3).

On September 20, 2022, Grayson pled guilty to Count One of the Superseding Information charging Civil Disorder in violation of 18 U.S.C. §231(a)(3).

## IV.    STATUTORY PENALTIES

The defendant now faces sentencing on Civil Disorder in violation of 18 U.S.C. § 231(a)(3).  As noted by the plea agreement and the U.S. Probation Office, he faces up to 5 years

of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Guidelines calculation set forth in the PSR, which is consistent with the agreed-upon Guidelines range set forth in the plea agreement.  *See* PSR ¶¶ 29-38, Plea Agreement p.3. The Guidelines are calculated as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | 10 |
| Total            10 | |
| Acceptance of Responsibility (U.S.S.G. §3E1.1) | -2 |
| **Total Adjusted Offense Level:** | **8** |

The U.S. Probation Office calculated Grayson's criminal history as category I, which is not disputed. PSR ¶ 45. Accordingly, based on the government's calculation of the Grayson's total adjusted offense level, after acceptance of responsibility, at 8, Grayson's Guidelines imprisonment

range is 0 to 6 months' imprisonment.  Grayson's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, most of the Section 3553(a) factors weigh in favor of a term of three months' incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.  As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.  Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would

have observed other extensive fighting with law enforcement.  While looking at the defendant's individual conduct, we must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

The nature and circumstances of this defendant's crimes weigh heavily towards a term of incarceration in the middle of the guideline range.  Grayson's statements prior to the riot and his purchase of tactical gloves demonstrate that he was prepared for violence.  He boasted about engaging in violence at the protests in the fall of 2020, albeit this is uncorroborated and may have been false boasting and wore tactical gloves to the Capitol on January 6, 2021.  He also flatly stated that he would storm the Capitol if asked.  While en route to the Capitol, Grayson heard that the

Capitol had been breached and he heard the flashbangs, and yet, he continued forward towards the under sieged Capitol.  He described how he was subject to tear gas while on the Capitol grounds and about how he saw people "going at it" as officers wearing riot gear were entering the crowd, likely referring to a violent clash between officers and rioters that occurred on the West front. Rather than leaving the area, he wanted to get to a vantage point to see the "action" from a safe place.

Grayson then ascended a staircase and went to the courtyard in front of the Senate Wing Doors.  There, he entered a mere 7 minutes after the area was breached by his fellow rioters.  He then proceeded to the overcrowded Crypt and livestreamed to his Facebook account.  Later, he ventured into the Rotunda, again livestreaming the conduct of other rioters in that area to his Facebook account.  When asked why he livestreamed, he said he felt he had to do it for his followers and felt he was being a patriot.

In the Rotunda, Grayson joined the rear of a mob forming in front of a line of police officers who were protecting a hallway that led to House Speaker Pelosi's office suite.  Not once, but twice, Grayson joined the rear of the group as it was attempting to push past the officers, but he eventually left when the crowd dispersed.  Grayson ultimately left the Capitol after being inside for over 45 minutes.

While Grayson made comments during a post-plea interview that what happened on January 6th was not the original "intention" for the day, that it was horrible, and that he would not even go inside now, any sense of remorse was effectively voided by his other comments during the interview.  For example, he stated that had there been a sufficient barrier around the Capitol grounds or someone telling him to stay out, he would not have entered.  One would think

flashbangs, tear gas, and riot officers should have been a sufficient deterrent. Also, the mere fact he heard the Capitol was "breached" while en route to the Capitol meant the rioters were not supposed to be there. Additionally, he commented that from a "tactical" perspective, he was baffled and puzzled at why such a limited number of officers were sent into the giant mob given how outnumbered they were. Yet, he forged forward towards the violence and towards the breached Capitol. Grayson even referred to the notion that the rioters were "storming" the Capitol as a joke because people were walking into the building. Grayson also stated that he wished he could have filmed all of the activity unfolding that day on Capitol grounds. These statements undercut any sense of remorse by Grayson in the weeks after January 6, 2021.

**B. The History and Characteristics of the Defendant**

As noted in the PSR, Grayson has multiple prior criminal convictions, for criminal conduct occurring between 2006 and 2017. These include a conviction for Simple Assault, a misdemeanor in violation of 18 § 2701(a)(1); Disorderly Conduct Hazardous / Physically Offensive, a misdemeanor in violation of 18 §5503(a)(4); and Harassment – Subject other to Physical Contact, a summary offense in violation of 18 §2709(a)(1). PSR ¶¶ 40-44.

Grayson boasted about having committed a violent attack at a prior protest in Washington, D.C.[6] He also ordered, and wore, tactical gloves to the Capitol and texted an associate that he may have to stay to do "street battle." He also claimed in a post-arrest interview that he did not touch or fight with anyone on January 6 and that he walked away when he saw something "weird." Yet, Grayson did not walk away when he saw the mob of rioters forming against a line of officers. He

[6] Even if Grayson did not commit an assault in November 2020, boasting about it, even falsely, condones and promotes violence.

joined in – twice.  Grayson's criminal history, his social media posts leading up to January 6, 2021, his activities in the Capitol, specifically the Rotunda, and his lack of sincere remorse about what occurred that day all warrant a sentence of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[7] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Grayson's criminal conduct, joining a mob of rioters attempting to push through a line of officers protecting the Capitol, is the epitome of disrespect for the law. When Grayson approached and later entered the Capitol grounds and the Capitol itself, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                      at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

***General Deterrence***

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. ' 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

---

[8] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

***Specific Deterrence***

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a three-month term of incarceration. First, although Grayson has a criminal history category of I, his history of arrest and conviction shows a clear pattern of assaultive behavior. *See* Section VI(B) *supra.* Second, Grayson has failed to express sincere remorse, and what remorse he did utter during his post-plea interview were completely undercut by statements he made during his post-arrest interview. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Grayson's own statements that he would have not gone in if there were sufficient barriers and/or someone telling him not to enter and that while he would not go back now, he would want to film the whole event demonstrates that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes like this, particularly in

light of his history of assault and violent rhetoric.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that Asignificantly increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

**F. Unwarranted Sentencing Disparities**

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Grayson and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 231 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in *United States v. Christian Cortez,* 21-cr-317 (TSC); *United States v. Derrick Evans,* 21-cr-337 (RCL); *United States v. Jennifer Heinl,* 21-cr-370 (EGS); and *United States v. Kelly O'Brien,* 21-cr-633 (RCL)

In *Cortez,* the defendant spent time on the West Lawn, similar to Grayson, and was in close proximity to the violence committed against officers. Cortez breached the Parliamentarian Door

at approximately 2:53 p.m., which is approximately thirty-three minutes after Grayson breached the Senate Wing Doors, and, similar to Grayson, Cortez joined a pack of rioters facing off with police officers attempting to prevent rioters from further penetrating the building. Cortez then left the Capitol, after being directed by officers. Cortez remained inside of the Capitol for approximately thirteen minutes, a period significantly shorter than Grayson. Outside of the Capitol, Cortez attempted to reenter the Capitol and also attempted to prevent Capitol police officers from securing the doors. Unlike Grayson, Cortez moved to the front of the group and began screaming at the officers while slamming his flagpole into the ground. He continued to scream at officers despite being subjected to OC spray. Unlike Grayson, Cortez did not post and encourage others to attend the protest on January 6, 2021 or promote violence. Additionally, Cortez, unlike Grayson, has no criminal history. Cortez pled guilty to violating 18 U.S.C. §231(a)(3). The government recommended four months' incarceration, three years of supervised release, $2,000 in restitution. The Court sentenced Cortez to four months' incarceration, three years of supervised release, 60 hours of community service, and $2,000 in restitution.

In *Evans,* the defendant, a former West Virginia state legislator, posted about the upcoming January 6th protest on his Facebook page in the weeks before January 6, 2021, similar to Grayson. Evans also extensively lived streamed from the Capitol to his Facebook page. He encouraged others to "take" the Capitol. Evans joined a crowd pushing against police line near the Rotunda Door, while being pepper sprayed and encouraging others to "Move! Move! Move!" Evans then entered the Capitol via the Rotunda Door. While inside, he shouted at others not to break or vandalize anything and reminded them that they were in a historical building. Evans then left the Capitol after being inside for approximately ten minutes, a period of time significantly shorter than

Grayson's invasion of the Capitol.  Evans later deleted his livestream video shortly after posting it.  Evans pled guilty to violating 18 U.S.C. §231(a)(3).  The court sentenced Evans to three months' incarceration and 36 months of supervised release.

In *Heinl*, the defendant, who traveled to Washington, D.C. with Grayson, entered the Capitol a few seconds after Grayson and through the same doors.  She claimed she entered the Capitol out of fear for her safety and then remained in the Capitol for approximately 45 minutes, including the Rotunda.  While in the Rotunda, Heinl did not join a mob of rioters who were attempting to push through a line of officers.  Heinl later exited the Rotunda Doors alongside Grayson.  During a pre-arrest interview, Heinl admitted to gong to the Capitol but provided false information about Grayson.  Similar to Grayson, Heinl failed to show sincere remorse for her actions on January 6, 2021.  Unlike Grayson, Heinl has no prior criminal history, and further compared to Grayson who wore tactical gloves, Heinl did not prepare for violence in Washington, D.C.  Heinl pled guilty to violating 40 U.S.C. §5104(e)(2)(G).  The government recommended a sentence of 14 days' incarceration followed 36 months of probation and the Court sentenced Heinl to 14 days' intermittent incarceration along with 36 months of probation.

In *O'Brien,* the defendant, like Grayson, also had a prior criminal record.  Similar to Grayson, in the months leading up to the siege of the U.S. Capitol, O'Brien made multiple social media posts encouraging others to go to Washington, D.C. on January 6, 2021.  O'Brien then filmed her journey towards the Capitol building and posted the videos to her Facebook account, similar to Grayson.  She then entered the Capitol via the Senate Wing Doors a few minutes after Grayson.  While outside of the Speaker of the House's office suite, which is adjacent to where Grayson joined a mob of rioters attempting to push through a line of officers, O'Brien encouraged

others to cause destruction to the area and then proceeded to walk through Nancy Pelosi's office suite. While she herself did not commit destruction, after exiting the office suite, she cheered on another rioter who removed a sign, which was later destroyed, identifying the Speaker of the House's office. Unlike Grayson, O'Brien did not join in any group of rioters attempting to break through a police line. O'Brien pled guilty to violating 18 U.S.C. § 1752(A)(1). The government recommended five months' incarceration and $500 in restitution. The Court sentenced the defendant to 90 days' incarceration and twelve months of supervised release.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[9] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Grayson must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Grayson played in the riot on January 6.[10] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-April 2022. *Id.*[11] Grayson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 141.

## VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 3 months' incarceration, which is a mid-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By: /s/ *Maria Y. Fedor*
MARIA Y. FEDOR
Attorney, detailed to the
United States Attorney's Office for the

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[11] In mid-October 2022, after the plea agreement was entered in this case, the approximate value of damages caused to the United States Capitol was updated to approximately $2,881,360.20.

District of Columbia
D.C. Bar No. 985823
601 D Street, N.W.
Washington, DC 20530
Maria.Fedor@usdoj.gov