**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Case No. 21-224 (TSC)** |
| | ) | |
| **KENNETH GRAYSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**<u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>**

Kenneth Grayson, now 53 years old, is a hard-working, kind-hearted father who traveled to Washington, D.C. from his home near Pittsburgh because the President had urged his supporters to come to protest an election that he repeatedly described as fraudulent.    Mr. Grayson had


Mr. Grayson with his daughter

grown increasingly engaged in politics during the Trump presidency and spent much of his spare time listening to podcasts and perusing political content on the internet. Encouraged by the President's inflammatory words, Mr. Grayson presented himself as an enthusiastic and fearless supporter of President Trump in social media communications with friends, even going so far as fabricating anecdotes to make himself sound tough and committed to supporting the President. On

January 6, 2021 Mr. Grayson joined throngs of people who marched to the Capitol following the President's speech.  There he made a mistake that he will forever regret: He joined a large group of people who walked into the Capitol building.  Mr. Grayson has pled guilty in recognition that his conduct was illegal and entirely wrong.

Mr. Grayson should be sentenced based upon his conduct and not his words.  While his decision to enter the Capitol is certainly worthy of sanction, Mr. Grayson did not engage in violence or damage any property on January 6.  He did not taunt, harass, or harm law enforcement officers.  Mr. Grayson's father was a police officer and he himself served as a juvenile correctional officer, so he holds members of law enforcement in extremely high regard.  The government has misinterpreted a brief moment when Mr. Grayson joined the back of a crowd that was engaged with a group of police officers inside the Rotunda.  During that brief interaction, Mr. Grayson did not intend to take part in any effort to push into the police officers.  He moved to the side and briefly watched what was happening while other protestors pushed forward before relenting and dispersing.  While inside the Capitol Mr. Grayson did not enter the Senate gallery or any private offices and he left peacefully.  When FBI agents came to arrest him for his involvement, he sat for an extended interview with them and was entirely respectful.

The parties agree with the sentencing guideline computation in the Presentence Investigation Report ("PSI").  The total adjusted offense level after a two-level reduction for acceptance of responsibility is 8.  Mr. Grayson fits in criminal history category I, resulting in the lowest possible advisory guideline range: 0-6 months.  Mr. Grayson has already faced several life-altering costs for his conduct; the sentence imposed by this Court on December 19 will not be the first time he faces real consequences for his actions.  First, Mr. Grayson has pled guilty to a felony here despite being among the least culpable January 6 defendants to face felony charges.  As this

Court is well aware, that felony conviction will follow him for the rest of his life, limiting employment opportunities, barring him from possessing a firearm, and restricting other invaluable rights including the right to vote.  Second, Mr. Grayson spent three days in jail in Pennsylvania after his arrest and – unlike most January 6 defendants who engaged in comparable conduct – has been on home detention wearing an electronic monitoring ankle bracelet for more than 22 months. Third, Mr. Grayson lost his job, his truck, and his home after his arrest and he has been living in the spare room of a friend's home for almost two years. It would be overly harsh to add time in prison to the list of devastating consequences already endured by Mr. Grayson.  The guidelines specifically contemplate a non-custodial sentence here and a sentence of probation with 60 or more hours of community service is sufficient and not greater than necessary.

## I.    PROCEDURAL HISTORY

Mr. Grayson was arrested at his home outside Pittsburgh, PA on January 26, 2021.  A detention hearing was scheduled in the Eastern District of Pennsylvania for January 28, 2021 and Mr. Grayson remained in custody until that date.  On January 28, 2021 the presiding magistrate judge ordered Mr. Grayson released on a $25,000 unsecured bond but that release order was stayed until January 29, 2021 based upon the government's representation that the United States Attorney's Office in Washington, D.C. was considering appealing the release order.[1]  Mr. Grayson was released from custody on January 29, 2021 after the parties reached an agreement adding home detention and location monitoring to his conditions of release.  Mr. Grayson has remained on home detention and has been wearing an electronic monitoring ankle bracelet for well over 22

---

[1] At the time of his initial appearance, there was apparently an arrest warrant from West Virginia for Mr. Grayson stemming from an allegation that he had retained a laptop and phone that had been provided to him by a former employer.  Mr. Grayson had been unaware of the charge and the warrant.  He has since resolved the warrant and the case was dismissed after Mr. Grayson successfully completed diversion.  PSI, ¶ 48.

months since that time and has not had a single alleged violation of his conditions of release.  Mr. Grayson entered a guilty plea to one count of civil disorder in violation of 18 U.S.C. § 231(a)(3) on September 20, 2022.  Sentencing is scheduled for December 19, 2022 at 2:00 p.m.  As set forth above, the parties and United States Probation agree that the guideline range is 0-6 months.

## II.      APPLICATION OF THE SENTENCING FACTORS

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added).  Honest application of the federal sentencing statute confirms that a sentence of probation to include community service is sufficient but no greater than necessary to meet the goals of sentencing.   What follows is a detailed review of the relevant §3553(a) factors.

### A.      Mr. Grayson's History and Characteristics

Kenneth Grayson was born and raised outside of Pittsburgh and has lived in the area for his entire life.  He has one sister, Dawn, who now lives in Florida.  Mr. Grayson's father and several other family members were police officers.  His interest in politics began early and he was elected Class Treasurer in high school, even meeting Bob Dole and George W. Bush. Mr. Grayson's primary focus was sports and he has identified as an athlete for much of his life.  He was a defensive captain on his high school and college football teams and even played semi-pro football for two years after college.  He attended Thiel College in Pennsylvania.  As an adult, Mr. Grayson continued to engage in athletics, but his interest shifted to boxing and tough man competitions. He fought professionally in West Virginia Tough-Man competitions for several years.  He also volunteered his time to train children at a local gym.  Mr. Grayson has had a handful of misdemeanor convictions after alcohol-fueled altercations that occurred at bars.  The last such

4

conviction occurred several year ago.  Prior to this case he had never been convicted of a felony or spent time in jail or prison.

       *i.*     *Employment History*

     Mr. Grayson has worked steadily since his graduation from college. He first owned his own commercial cleaning company for 12 years.  He then worked in real estate and as a private investigator for a law office.  Beginning in approximately 2008 Mr. Grayson worked as a juvenile counselor at a juvenile detention facility in Baldwin, PA.  He remained in that job for 3 ½ years until 2012, when he was driving a van with detainees in it that was hit by gunfire from a .40 caliber firearm.  No longer able to work in corrections, Mr. Grayson shifted into the oil and gas industry. He started working on oil wells as a flowback operator, a dangerous and arduous job requiring Mr. Grayson to oversee the opening of newly drilled wells.  When a well is opened for the first time, the fluid that is produced for 30 to 120 days is a mixture of crude oil, natural gas, water, and sand. The flowback operator oversees all the equipment used to separate the fluid and keep the well flowing until it more freely produces oil and gas.

     Mr. Grayson worked long hours seven days per week at sites all over the country and lived out of hotels.  He was so good at the job that he was hired by numerous companies over the years as they opened new wells for production.  His hard work paid off: he moved up the ranks quickly. He started as a field technician and was promoted to flowback operator and supervisory roles overseeing dozens of workers preparing oil pads for full-scale production.  David Dinger, a former flowback hand working under Mr. Grayson, explains that the work was very dangerous but that "we knew if Ken was our company man that we were in good hands and safe."[2]  Mr. Grayson was such a skilled, valued employee that he was earning approximately $150,000 per year at a company

---

[2] Letter of David Dinger, attached as Exhibit 2.

called Rice Energy.  The company was a great fit for Mr. Grayson, he was a valued employee, and he planned to stay on with the company for the rest of his career.  Unfortunately, the company was sold and Mr. Grayson moved on to two new energy companies where he continued to focus on flowback programs.  Before his arrest in this case, Mr. Grayson had reconnected with Ryan Rice from Rice Energy and was working with him on the creation of an online application facilitating communication between oil well engineers and those tending wells on the ground.  Mr. Grayson was laid off from this job following his arrest in this case because of the negative publicity his arrest generated.  Nevertheless, his former boss, Ryan Rice, wrote a letter of support that speaks to Mr. Grayson's character.  Mr. Rice recounts how, when Mr. Grayson worked for Rice Energy, he worked 12 hour days and still found time to provide information about how Mr. Rice could improve morale of workers and the safety of the operation.[3]

After his arrest, Mr. Grayson looked hard for work with similar pay and advancement opportunities, but opportunities were limited.  He now works as a shop coordinator at a company called Bluewater, Inc. where he and other employees service equipment after it has been used on an oil pad during the flowback process.  He earns significantly less than he once did and there is little, if any, opportunity for advancement beyond his current position.

      *ii.*    *Commitment to Family*

Mr. Grayson has a daughter, Gabriella, who means the world to him.  Although Mr. Grayson and Gabriella's mother separated when Gabriella was a child, Mr. Grayson has remained closely involved in her life.  She and her mother live close by and during her childhood Mr. Grayson had her on weekends and saw her regularly during the week because of their proximity. Mr. Grayson's friend Jessica Hall writes:

---

[3] Letter of Ryan Rice, attached as Exhibit 2.

He spent most of his time with her; car pooling, taking her to and from her jobs, dinners, rides to activities, running here and there. He doted on her- always making sure she was well loved, taken care of, working hard in school, etc. She's grown up to be a wonderful young woman and her dad is still 100% in her corner and involved in her daily life.[4]

Mr. Grayson's former mother-in-law writes that: "I cannot remember Kenny ever missing a birthday or holiday celebration or religious ceremony. He was always there."[5] Gabriella moved in with Mr. Grayson during her senior year of high school, he bought her a used car, and she graduated with her class. Mr. Grayson proudly reports that his daughter will soon graduate magna cum laude from Carlo University in Pittsburgh with a major in art therapy. She has plans to attend graduate school. The two remain very close to this day. [6] According to Renee Czerwien, a friend of Mr. Grayson for 25 years: "I adore their relationship. I don't think a girl could ask for a better father. I always enjoyed hearing about trips they took together or seeing their selfies from a lunch date. They have a special bond."[7] This observation is shared by all of his friends. Mr. Grayson's friend Matt Fox writes:

> Each time I see Ken to catch-up, one of the first things he always loves to talk about is the love and achievements of his daughter, Gabby. It has become pretty funny because I can predict it like clockwork within the first few minutes of talking to him each time. He speaks about her glowingly and how well she has done in college and how he is excited for her to continue on to graduate school in Colorado. It doesn't take long to realize that this is his most cherished thing in life.[8]

Mr. Grayson is also very close to his parents, both of whom are elderly, infirm, and rely upon him heavily. Because his sister (his only other sibling) lives in Florida, Mr. Grayson has been their main source of support and assistance. As their health has declined they have become more and more dependent upon Mr. Grayson's assistance. Mr. Grayson's mother is 76 years old

---

[4] Letter of Jessica Hall, attached as Exhibit 2.
[5] Letter of Kathleen Cleaver, attached as Exhibit 2.
[6] Mr. Grayson's daughter plans to attend the sentencing hearing in person.
[7] Letter of Renee Czerwien, attached as Exhibit 2.
[8] Letter of Matthew Fox, attached as Exhibit 2.

and has stage 4 COPD and receives oxygen 24 hours per day.  His father, now 78, has failing kidneys, congestive heart failure, neuropathy, and several other health issues.  Mr. Grayson's parents report that they depend upon Mr. Grayson to do the shopping, take them to doctor and other appointments, and perform repair and maintenance of their home.  Mr. Grayson's friend Renee Czerwien writes that Mr. Grayson's parents "have always been the center of his life" and that he "worries about who will care for them if he is away."[9]  As this sentencing memorandum is written, Mr. Grayson's father has been hospitalized for several days and he is expected to return home on hospice care.  Mr. Grayson is understandably worried and deeply saddened.

### iii.    Mr. Grayson's Own Health Problems

Mr. Grayson himself suffers from a number of health issues that have made his day-to-day existence more difficult.  Heart issues and high cholesterol run in Mr. Grayson's family and he suffered a heart attack at the age of 39; doctors put a stent in his circumflex artery afterwards.  He is on cardiac medications because of his history of coronary artery disease.  Mr. Grayson has serious arthritis in his shoulders and has been told he will likely to have them replaced.  Mr. Grayson also suffers from severe obstructive sleep apnea and he must use a CPAP machine, without which he would experience significant stress on his heart, lungs, and brain. According to his doctor, were he incarcerated, Mr. Grayson would need to have special accommodations made to provide a CPAP machine and assure that his medication regimen is followed closely.[10]

### B.    The Nature and Circumstances of the Offense

Mr. Grayson has had a longstanding interest in politics and as he aged and became less able to participate in competitive sports, more of his time was focused on engagement in politics. This engagement coincided with the candidacy and ultimate election of President Trump.  Mr.

---

[9] Letter of Renne Czerwien, attached as Exhibit 2.
[10] Letter of Elizabeth Casario, attached as Exhibit 2.

Grayson spent time online and gravitated to pro-Trump websites, Infowars, and QAnon-related content.  Mr. Grayson wore a jacket with a prominent yellow "Q" affixed to it on January 6 and told law enforcement officers during his post-arrest interview that he viewed QAnon content as legitimate because former U.S. National Security Advisor Michael Flynn was involved with the group.  To be clear, Mr. Grayson has never been involved in extremist groups that advocated violence or hatred for other groups.

Mr. Grayson came to Washington, D.C. on January 6 because President Trump encouraged American citizens to come to this city.  Whatever one thinks about Donald Trump, it cannot be ignored that he was not a normal civilian at the time of these events.  He was the *President of the United States*; the highest official in our country having been elected in 2016 with the votes of several million Americans.  He lived in the White House, his speeches were covered by all national news networks, he spoke behind a podium with the Presidential seal, and he had full United States Secret Service protection. The President of the United States, who had promised that the event would be "wild," urged these citizens to march to the Capitol after giving an incendiary speech emphasizing the importance of this moment in history and the necessity of fighting to stop the certification of the election.  While this by no means excuses the actions of the citizens who entered the Capitol, and certainly not those who engaged in violent conduct, it provides context for Mr. Grayson's actions: he was acting in response to repeated statements by the President of the United States that, at a minimum, suggested that strong Americans should not stand down and permit the certification to occur.  Mr. Grayson told the agents who interviewed him that he took it "seriously" when "you get invited literally by the President to be somewhere." He felt that his trip to Washington was a patriotic act.  But he further explained that he never would have taken part if he had known the situation would become so destructive.

Mr. Grayson drove to Washington, D.C. with three friends on January 5.  They spent the night in a hotel and in the morning walked to the Ellipse to listen to President Trump's speech. President Trump, after several minutes of reiterating his claims that the election was stolen, said the following to the crowd (including Mr. Grayson):

> We will not let them silence your voices. We're not going to let it happen, I'm not going to let it happen…..We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – to save our democracy….Now, it is up to Congress to confront this egregious assault on our democracy.  And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike Pence agrees to send it back…If not…you will have an illegitimate President.** That's what you'll have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….**And we fight. We fight like hell**. **And if you don't fight like hell, you're not going to have a country anymore…..So we're going to, we're going to walk down Pennsylvania Avenue…And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country.. So let's walk down Pennsylvania Ave.**[11]

Later that day, even as the Capitol building was under attack, the former President Trump did and said nothing for hours.[12]  The only thing he did during the crucial hours of the attack was post a Tweet at 2:24 p.m. saying "Mike Pence didn't have the courage to do what should have been done to protect our country and our Constitution."[13] The Honorable Amit P. Mehta alluded to this issue

---

[11] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (last viewed on Nov. 22, 2022). (emphases added).

[12] Jonathan Allen, *On Jan. 6, Trump ignored all pleas to call off the mob attacking the Capitol while 'pouring gasoline on fire' aide says*, NBC News, July 21, 2022, available at https://www.nbcnews.com/politics/congress/prime-time-jan-6-hearing-focuses-trumps-inaction-187-minutes-mayhem-rcna36737

[13] Ewan Palmer, *Donald Trump Tweeted Attack on Mike Pence Minutes After Hearing VP Was Fleeing Capitol Rioters*, Newsweek, February 11, 2021 available at https://www.newsweek.com/donald-trump-tweeted-attack-mike-pence-minutes-capitol-rioters-1568568. (last viewed on November 29, 2022).

in a recent sentencing hearing encouraging us all to ask ourselves why ordinary American citizens

from all over the country with good backgrounds and steady jobs came together to commit these

acts. *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-28.

Judge Mehta opined that this was able to occur because of:

> [T]he power of propaganda; the power of being told lies over and over and over
> again; told by leaders who knew better, that something was taken away from
> people when it wasn't…The idea that people who have otherwise led modest and
> humble lives, who have not been political agitators, political activists, are now
> facing serious jail time is extraordinary. *Id.*

Mr. Grayson joined the throngs of people walking towards the Capitol after President

Trump's speech.  Upon arrival he heard what were likely flash-bang grenades and saw altercations

between Trump supporters and police.  Mr. Grayson did not engage in these interactions.  He

moved to a quieter area at the top of the stairs and soon saw that people were entering the building

through the Senate Wing Doors.  Mr. Grayson saw that people were entering the building without

any resistance from the police and that there was no violence occurring in the area of the entrance

to the building, so he joined throngs of people entering through the Senate Wing Doors. To be

clear, this does not excuse his entry into the building.  It does, however, differentiate him from

people who actively sought to fight through lines of police officers seeking to prevent entry into

the building.  Mr. Grayson then moved through the Crypt and into the Rotunda, following along

with the crowds of people while filming on his phone and engaging in neither violence nor

destruction of property.  He did not enter any offices nor did he enter the Senate gallery or chamber.

He ultimately walked out of the building of his own free will without having harmed anyone or

anything.  Mr. Grayson now knows that the worst decision of his life was that instead of remaining

outside the building, he followed the crowd into the Capitol.

Following his arrest, Mr. Grayson immediately cooperated with arresting officers, sitting

for a lengthy interview and voluntarily providing passwords for his electronic devices, including his cellular phone and computer.  He further provided consent for agents to search his vehicle. And Mr. Grayson has abided by his strict conditions of release during the pendency of this case without incident, showing his respect for the law and for this Court.

Having provided an overview of Mr. Grayson's conduct on January 6, the defense now turns to two issues the government has focused on most: an incident that occurred in the Rotunda and Mr. Grayson's statements to friends and family online.

      *i.*     *Rotunda Incident*

The government has focused its attention on a brief period while Mr. Grayson was in the Rotunda when he joined a group of protestors who had assembled at a doorway, some of whom were interacting with officers blocking entry to that doorway.  Mr. Grayson heard yelling and saw a crowd forming and walked to the area to see what was happening.  Individuals in the front of the crowd were yelling at police and some engaged in brief pushing matches with those officers.  Mr. Grayson was several feet behind these people and many people were between him and the officers. Mr. Grayson was not doing or saying anything during this time – he was merely looking over the crowd to see what was happening.  Videos show that protestors then began pushing forward against the officers for a short period and Mr. Grayson could be seen moving forward with the group. During that period of seconds, Mr. Grayson moved to the right and out of the line of people moving towards the officers in the doorway.  Other protestors who had been behind Mr. Grayson moved past him and towards the officers in the doorway as Mr. Grayson remained outside the doorway to its right.  Mr. Grayson remained in the back of the group, looking on, when members of that group again tried to push forward against the officers.  Mr. Grayson did not push forward; he was watching from behind.  Mr. Grayson readily acknowledges that he should not have approached

this group of people to see what was happening. But he also maintains that he did not join this group of people in trying to push forward against the officers. He was pushed from behind, but he was able to get his footing and move to the side and out of the group who were pushing into the officers.

This moment and Mr. Grayson's actions at that doorway in the Rotunda have been the focus of the government's evaluation of Mr. Grayson's relative culpability and altered the parties' plea negotiations in this case dramatically. Prior to undersigned counsel's involvement in this case, a misdemeanor plea offer to the charge of Entering or Remaining on Capitol Grounds in violation of 18 U.S.C. § 1752(a)(1) was conveyed to Mr. Grayson and he was prepared to accept that offer. The government then located video footage of the Rotunda incident and notified the defense that it was no longer willing to offer a misdemeanor plea.[14] Despite the defense's efforts to convince the government otherwise, the government was only willing to resolve the case with a plea to the felony of Civil Disorder. Mr. Grayson entered a plea to this count because he wanted to accept responsibility and acknowledged that his conduct was criminal.

Mr. Grayson has been adamant from the beginning that he would never disrespect or engage in violence towards law enforcement. His father and several other family members were police officers. He himself worked as a correctional officer for several years. Many of his friends have been or are active duty members of our military. Because the nature of Mr. Grayson's conduct during those short moments in the Rotunda is a subject of dispute between the parties, the defense has elected to provide the Court with a number of video exhibits of the incident, taken from a Capitol surveillance camera, by a member of the press, and by participants on that day on their personal cellular phones.

---

[14] That video, taken by a member of the press, is being provided to the Court separately as Exhibit 4.

The videos demonstrate that Mr. Grayson did not participate in efforts to push against a line of officers two times during that incident. He was pushed from behind and quickly extricated himself from the group that was pushing forward against the officers, only watching from behind to see what was happening. Exhibit 3, taken from a Capitol Surveillance camera across the Rotunda, shows Mr. Grayson join the rear of the crowd and at minute marker 2:08 shows people behind him moving forward towards the door. Exhibit 4, taken by a member of the press, shows the incident from closer up. At approximately 1:15, Mr. Grayson can be seen being pushed from behind by a group of people as the crowd moves forward. Despite their efforts to push him forward and rather than moving forward into the doorway and towards police, Mr. Grayson can be seen moving to the side and out of the doorway, intentionally stopping his movement through the doorway and into members of law enforcement.

After being pushed forward, Mr. Grayson affirmatively moved himself to the right and out of the path of the rioters who were pushing into officers. To be clear, Mr. Grayson was a football player, boxer, and tough man competitor. If he had wanted to push forward in an ongoing effort to confront or cause harm to the officers in the doorway, he certainly could have done so and his intentions would have been readily apparent from the video. What the videos reveal, however, is that he moved to the side and that protestors who had been behind Mr. Grayson passed by him as he remained behind the doorway, not making efforts to confront the officers. Exhibit 5, taken by another defendant, shows that defendant push past Mr. Grayson into the doorway when Mr. Grayson had extricated himself from the group. Exhibit 6 depicts the moment after the first push when the government suggests that Mr. Grayson again pushed with the crowd. What the video shows is that Mr. Grayson stood in the rear of the group peering into the doorway to see what was happening. He did not push the group that was engaging with officers.

*a. Comparison to Other Defendants Involved in Rotunda Incident*

In evaluating the seriousness of Mr. Grayson's conduct during that incident and determining his relative culpability, it is helpful to examine the conduct and outcomes in cases of a handful of other defendants who were involved in the same incident. The defense has been able to identify several individuals whose cases have been resolved.

**Michael Rusyn and Deborah Lee, No. 21-cr-303 (ABJ)**

Mr. Rusyn and Ms. Lee were also part of the crowd in the Rotunda with Mr. Grayson. Video from Mr. Rusyn's cell phone is included as Exhibit 5. The video shows that Mr. Rusyn was initially at the front of the crowd that was yelling at police officers. Mr. Grayson can be seen approaching the group at approximately minute 1:24, identifiable by his backwards black baseball cap and the yellow cloth visible around his neck. At 2:33, moments before members of the crowd began pushing against officers, Mr. Grayson can be seen with a man behind him wearing goggles


**Mr. Rusyn and Ms. Lee pushing past Mr. Grayson**

and a handkerchief over his face. Mr. Grayson can then be seen at 2:55 moving to the side of the crowd next to the doorway and not proceeding further. In contrast, at 2:55 Mr. Rusyn and Ms. Lee pushed *past* Mr. Grayson into the crowd and past the doorway, moving towards law enforcement while yelling. This makes clear Mr. Grayson's intent: unlike Mr. Rusyn, Mr. Grayson did not seek to push through the doorway to directly confront law enforcement. Also unlike Mr. Grayson, Mr. Rusyn and his co-defendant Lee had

entered the Capitol through the eastern Rotunda door and were among the first to enter after it had been violently breached by assaulting police officers. ECF No. 49. They then were close to the front of a group that overwhelmed another group of officers trying to stop their progress within the building. They wandered the halls trying to enter doors along the way. *Id.* Despite the fact that both defendants intentionally surged against police during the Rotunda incident, Ms. Lee has only been charged with misdemeanors (her case is still pending) and Mr. Rusyn recently pled guilty to Class B Misdemeanor Parading inside the Capitol in violation of 40 U.S.C. § 5104 and was sentenced to 2 years of probation with 60 days of location monitoring. ECF No. 62.

### Thomas Conover, No. 21-743 (FYP)

Mr. Conover, easily identifiable in a blue sweatshirt reading "Freedom" on the back, can also be seen in Exhibit 4 at minute marker 1:23 moving forward and past Mr. Grayson into the scrum. According to the government, Mr. Conover joined the crowd in its efforts to overwhelm a line of law enforcement officers and was seen pushing his phone in the face of law enforcement officers and pointing his finger at them. After he left the Capitol, Mr. Conover filmed a video of himself with a can of beer and stated: "I DON'T ALWAYS STORM THE CAPITOL OF THE UNITED STATES OF AMERICA. BUT WHEN I DO, I PREFER COORS LIGHT." ECF No.


**Mr. Conover pushing past Mr. Grayson**

23. Mr. Conover benefited from a plea agreement to one count of Class B Misdemeanor Parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G) and he was sentenced to 3 years of probation

to include 30 days in a residential reentry center and 60 hours of community service.  ECF No. 33.

### *Jon Thomas Mott, No. 21-cr-464 (RCL)*

Jon Thomas Mott was among the people in the front of the group in the Rotunda directly engaging with law enforcement officers.  He can be seen in the below image identified



with a red circle.  Mr. Grayson is identifiable further back in the crowd on the left side of the image as the man with the black hat with a yellow P.  In another video from this incident cited in Mr. Mott's criminal complaint, Mr. Mott can be heard telling an MPD officer "Don't touch me," and "if you don't touch me, I won't touch you," and then pushing against the MPD officer's baton. ECF No. 1.  Further, following his participation in the riot, Mr. Mott posted an online statement celebrating his involvement, stating "We'll do it again if we have to!!!!!!"  *Id.*  Thus, unlike Mr. Grayson, Mr. Mott was at the front of the crowd initially confronting officers in the Rotunda, he directly pushed against an officer, and he celebrated his involvement afterwards.  Nevertheless, Mr. Mott was offered – and recently accepted – a plea  agreement to one count of Class B Misdemeanor Parading in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).  ECF No. 45.

### *Edward Spain, 21-cr-651 DLF*

On January 3, and 4, 2021, Spain posted the following message to his Parler account: PUBLIC SERVICE ANNOUNCEMENT: THE CIVIL WAR IN THE UNITED STATES IS

EMMINENT!! THIS IS AN EMERGENCY ANNOUNCEMENT!! ARM YOURSELVES WITH WEAPONS AND FIGHT FOR YOUR COUNTRY!! LOCAL LAW ENFORCEMENT AGENCIES WITH COLLAPRSE EMERGENCY FIRST RESPONDERS WILL BE OVERWHELMEDSTAY TUNED TO YOUR LOCAL EMERGENCY BROADCAST NETWORK FOR FURTHER INFORMATION.

Mr. Spain was among those involved in the confrontation of MPD officers in the Rotunda. The government's sentencing memorandum included this picture showing Mr. Spain near the front of the group. As he was exiting the Capitol, Mr. Spain was alleged to have encouraged several



other rioters to go into the Rotunda and pushed them in that direction. ECF No. 20. After leaving the Capitol, Mr.

Spain posted: "I was there!! I will remember this day forever. What we did as Americans will live in Eternity!!" The following day, on January 7, 2021, Spain posted: "I am speechless! Of the Events of yesterday. Angered by the sudden reversal on objections. Not following the Constitution??? We Americans are no longer living in a free democracy, we are banana republic. Its GO TIME! LOCK AND LOAD!! DO NOT LET GO YOUR GUNS!!" ECF No. 20.  Mr. Spain was offered a plea to Class B Misdemeanor Parading in the Capitol Building and was sentenced to 3 years of probation, to include 60 hours of community service.  ECF No. 24.

ii.     *Mr. Grayson's Online Statements to Friends and Family*

The government has also focused on comments made by Mr. Grayson found on Facebook and in a search of the contents of his cellular phone.  Mr. Grayson made statements to an acquaintance and family members through Facebook Messenger during a time when bravado and willingness to sacrifice for President Trump were normalized and encouraged on television, by the President and his associates, and online.  Essentially parroting the rhetoric of the President and his supporters, Mr. Grayson bragged to a friend that he would "storm the Capitol" if President Trump told him to do so.  In an earlier isolated exchange, Mr. Grayson, in a moment of misguided bravado, bragged about taking part in in a violent confrontation during an earlier trip to Washington, D.C.  This exchange occurred after Trump supporters had clashed with counter-protestors and – apparently – members of Antifa, a group that has been anathema to Trump supporters around the country. There were widespread accounts of Antifa members harassing and attacking Trump supporters at the time and many Trump supporters believed that Antifa members were likely to engage in violence in Washington, D.C.  Mr. Grayson, concerned about these reports, wanted to make himself out to be a protector of fellow Trump supporters.  Mr. Grayson did come to Washington, D.C. to take part in a protest organized by supporters of President Trump on that day, but he had left to visit a friend in Virginia at the time there were isolated confrontations between protestors in the downtown area.  Surely, if there were proof that Mr. Grayson had in fact been involved in any violence, the government would be able to produce evidence of it.  The government has acknowledged that there is no such evidence.  Mr. Grayson was not in fact present and was not involved in any violent conduct.

Mr. Grayson acknowledges that those statements were inappropriate even though they were not based in reality.  Mr. Grayson's online comments were similar to those made by many

defendants in January 6 cases.  He told stories to sound tough and act as if he was more involved

than he was and recognizes that this was wrong.  But it does not make him more criminally

culpable.  His conduct on January 6, when he did not engage in any violence, shows how baseless

this puffery was.  The fact that Mr. Grayson did not engage in violence despite seeing violence

around him demonstrates his true character.  In his letter to the Court, Mr. Grayson tries to explain

what led him to write these things to friends in private chats:

> I am embarrassed by reading now some of the things I said to friends on social
> media during that time. I hope you can understand that it was only talk. I'm
> physically only a shell of the guy I used to be. I am almost 52 with a wrecked body,
> so this is where my mouth gets me into trouble occasionally. It is hard to admit to
> myself, let alone a stranger, that all I do now mostly is talk a lot of mess. The
> messages were trying to sound tough and even included stories of things I never
> did to sound tough and act as if I was more involved than what I actually was. I
> never attacked, hurt, or even touched anyone ever at any political event that I've
> ever been to - especially in Washington DC. I used social media to create a Persona
> through memes and political posts. I barely follow sports anymore, so this became
> my hobby as I thought it was my way of doing my part, since I'm not a hero that
> serves this country like my friends have and still do.[15]

### C.     The Need to Reflect the Seriousness of the Offense and Provide Just Punishment

Given all of the consequences and restrictions Mr. Grayson has already endured due to

his conduct, adding a prison term in this case would be overly harsh.

> People are all very quick to suggest that the only real punishment is a jail sentence,
> and it's just not true. People can suffer in many different ways and do suffer in
> many different ways a result of their conduct and that is something every judge, at
> least on this court, I believe, understands, and takes into account when they're
> fashioning the appropriate sentence.[16]

---

[15] Letter of Kenneth Grayson, attached as Exhibit 1

[16] Quote from the Honorable Amit P. Mehta, *United States v. Andrew Cavanaugh*, 21-cr-362
(APM), Sentencing Transcript at pg 29.

Mr. Grayson has already had his life completely turned upside down as a result of his conduct on January 6. First, a large team of federal agents surrounded his home to execute an arrest warrant, frightening him and his girlfriend and alarming his neighbors. Mr. Grayson was held in jail for three days in Pennsylvania before he was released from custody. His arrest and prosecution have been extensively covered in the Pittsburgh press, humiliating his daughter and parents. He lost his job and had to move out of his home and into the spare bedroom of a friend, where he has remained for almost two years now. He lost his truck and his savings have been depleted. His belongings have been in a storage unit for almost two years. His sister believes that she was terminated from a job she loved in Florida solely because of her relationship with him. Whether or not this is true, the weight of knowing that his sister holds him responsible for losing a job is very hard to shoulder for Mr. Grayson.

Further, Mr. Grayson pled guilty to a felony in this case despite being among the least culpable defendants who were not offered misdemeanor pleas.[17] He had never before been convicted of a felony and will suffer the collateral consequences of that conviction for the rest of his life. Every effort to find new employment will be hindered by the felony on his record. He can no longer possess a firearm. His right to vote is restricted. All of these consequences cannot be overstated, and they are not shared by the hundreds of January 6 defendants who were charged with – or resolved their cases with pleas to – misdemeanor offenses.

Perhaps the most important factor that differentiates Mr. Grayson from defendants in January 6 cases with relatively low guideline sentencing ranges who received some prison time at

---

[17] The government's sentencing memo includes a typo suggesting that cases with facts analogous to this have typically been handled as misdemeanors. *See* U.S. Sentencing Memo, p. 21 ("To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in <u>misdemeanor</u> cases." (*emphasis added*)

sentencing is that Mr. Grayson has been living under restrictive pretrial release conditions for more than 22 months.  Most, if not all, defendants with sentencing ranges of 0-6 months have been granted pretrial release with relatively lenient conditions.  As a result, they have been able to continue living their lives with little change while awaiting the outcome of their case.  They arrive at their sentencing hearing having experienced few limitations on their liberty related to their conduct.  Most relevant on this point is the case of Jennifer Heinl, who traveled to Washington, D.C. with Mr. Grayson and was inside the Capitol with him.  *U.S. v. Heinl*, 21-cr-370 (EGS).  Ms. Heinl  was sentenced to 14 days in custody, but she received a misdemeanor disposition – not a felony - and was out of custody with no significant restrictions prior to her sentencing.



**GPS Monitor on Mr. Grayson's Ankle for 22 Months**

Mr. Grayson's situation is different than these defendants.  At the time of his initial appearance Mr. Grayson learned of the existence of a warrant from West Virginia related to a criminal complaint filed by a former employer who alleged that Mr. Grayson had retained a work laptop and phone provided to him as part of his work.  Mr. Grayson had not been aware of the charge or the warrant (a certified letter had been sent to his previous address and was signed for by the subsequent resident) and he cleared it up as soon as he was given the opportunity to do so.  That matter has since been dismissed after Mr. Grayson completed a short diversion period.  But that unresolved warrant, along with other arguments raised by the government, resulted in Mr. Grayson

being placed on home detention during the pendency of this case and an electronic GPS monitoring bracelet was affixed to his ankle. Those conditions have remained in place for more than 22 months. He has been permitted to leave home only for work purposes and to see his parents and he has been prohibited from traveling outside the Eastern District of Pennsylvania. As a result, he has been unable to attend dinners with friends, funerals, special events, and everyday impromptu time with family and friends outside of his home. Having an electronic monitoring box strapped to one's ankle for nearly two years is a significant impediment on liberty. Moreover, Mr. Grayson experiences chronic pain stemming from arthritis in his shoulders. He has found that medical marijuana was effective at reducing his pain and he had a medical card in Pennsylvania. Since his arrest, he has been unable to use this prescribed treatment, and he has been required to call in to a recorded line every day to determine whether he is required to travel to a testing center to subject him to urine testing. At least once per month he is called in for drug testing.

During these last 22 months, Mr. Grayson's life has been necessarily monastic despite the fact that he has always been a gregarious, social man. He lives in a spare bedroom at a friend's house. He goes to work six days per week and returns home immediately thereafter. He goes to his parents' home every week to mow the lawn and eat dinner. The restrictions have changed his life dramatically. His friend Renee Czerwien writes:

> Mr. Grayson has a passion for life and living it to the fullest. From traveling with his daughter, attending concerts, watching sporting events with friends and I have witnessed how his restrictions have changed all of that for him. I have seen him go through ups and downs over the years, this is by far the worst.[18]

It should come as no surprise that Mr. Grayson is exhibiting signs of anxiety and depression. Yet despite these life-altering restrictive conditions and the stress caused by having an electronic device permanently affixed to his body, Mr. Grayson has complied with all conditions of his

---

[18] Letter of Renee Czerwien, attached as Exhibit 2.

release and has been completely respectful towards his supervising United States Pretrial Services Officer.  His conduct on pretrial release reflects how seriously he takes this case and demonstrate that he fully understands the significance of his actions.  Adding prison time beyond the time Mr. Grayson already spent awaiting release in Pennsylvania would serve no purpose identifiable under the sentencing statute.

### D.       The Need to Avoid Unwarranted Disparities

The defense here provides examples of cases in which defendants pled guilty to the same felony charge as Mr. Grayson to demonstrate that he is among the least culpable defendants to be convicted of this charge.  His sentence should reflect this fact.

### *U.S. v. Daryl Johnson, 21-cr-407 (DLF)*

The § 231 case with facts most similar to Mr. Grayson's is that of defendant Daryl Johnson, but Mr. Johnson's conduct was clearly significantly more serious than Mr. Grayson's.  Instead of walking through an open door, like Mr. Grayson, Mr. Johnson climbed in through a broken window.  While inside the Capitol, Mr. Johnson joined a group of rioters who charged a line of officers trying to prevent additional rioters from entering the East Rotunda doors.  He and others pushed through the officers and pushed open those doors, allowing additional rioters to enter.  Mr. Johnson then climbed stairs to the third floor where his family member tried to open a locked door to a private room.  Mr. Johnson's enthusiasm was unabated after January 6, as reflected in his social media posts.  For instance, on January 7, 2021, Johnson posted to his public Facebook page:

> Mark my words Yesterday will be the beginning of the revolution That crowd was full of several million patriots that got off the couch and came to DC – most of them had never been to a rally EVER! Think about it – if can get 50+ year old men and women upset enough to spend thousands of $ to come to a rally what happens when those same people decide to throw out the "elected officials" It will be hangings on the front lawn of the capital – that crowd is not messing around – I now understand what our founding fathers gave up their fortunes for freedom – The generation will follow suit.

On January 13, 2021, Johnson sent a private message on Facebook about his participation in the riot, stating: "It was a large group that was in the capital But the left is going to do all they can to paint all conservatives as evil Put on your big girl panties! It's going to get very ugly and probably result in some version of a civil war." And, finally, over a month after the January 6 riot, on February 7, 2021, Johnson posted: "Bring it on Biden! I have no problem dying in a pool of empty shell casing."  ECF No. 57.  Mr. Johnson was sentenced to 30 days incarceration and 12 months of supervised release.  ECF No. 72.  The defense request for probation and community service is eminently reasonable when viewed in comparison to the sentence imposed in Mr. Johnson's case.

### U.S. v. Derrick Evans, 21-337 (RCL)

Derrick Evans was a member of the West Virginia House of Delegates who encouraged others to travel to Washington on January 6 on his public Facebook page with language including "A STORM IS COMING… AND THERE IS NOTHING THE LEFT CAN DO TO STOP IT!" While at the Capitol, Mr. Evans recorded a livestream video for his followers, including stating that things were going to get "wild" and that his followers "might want to get bail money ready for people who are going to do this," and later: "I bet Trump would pardon anybody who gets arrested for goin' in there."  ECF No. 47.  Mr. Evans, wearing a helmet, continued to narrate ("the cops are running!" "There's cops on the inside stopping us now.") as he joined a crowd pushing against police to pry open the Rotunda doors and ultimately succeeded in entering.  After leaving the Capitol, Mr. Evans sought to delete any evidence of his involvement, and when interviewed by law enforcement he lied about his conduct.  ECF No. 47.  Mr. Evans was sentenced to 3 months incarceration and three years of supervised release.  ECF No. 53.

*U.S. v. Andrew Griswold, No. 21-459 (CRC)*

Andrew Griswold was part of the same crowd that forced its way into the Rotunda doors despite the resistance of several overwhelmed officers.  Mr. Griswold joined with other rioters and pushed in unison against the officers trying to hold the door closed, yelling "Heave!"  Mr. Griswold walked upstairs and through halls in the Capitol, knocking on a door as he passed, as if to alert civilians inside that the rioters had arrived, and yelling "we're back here for our votes!" and "1776 all over again."  Mr. Griswold entered the Senate gallery, throwing his arms in the air and yelling, "this is our house now!"  When he finally left the Capitol, Mr. Griswold was interviewed by a member of the press on the Capitol steps, during which he said:

> We took the building. They couldn't stop us. And now they know we can do it again and we will fucking do it again. This is America and we love this country and they are not going to fucking take it again. Pelosi, Schumer, all you mofos, back off, this is our country, we are willing to do whatever it takes to keep it. Don't mess with us. Back off. This is our country. We showed 'em today. We took it. They ran. And hid.

ECF No. 52.  Mr. Griswold subsequently destroyed evidence on his phone in an effort to avoid culpability.  Mr. Griswold had seven prior convictions and had been on probation as recently as 2018.  He was sentenced to 75 days' incarceration and 2 years of supervised release.  ECF No. 56.

*United States v. Christian Cortez, No. 21-317 (TSC)*

This Court sentenced Mr. Cortez not long ago and is therefore quite familiar with the facts of his case, but it should be noted that the government's account of his conduct in its sentencing memorandum here is quite sympathetic when compared to the account in the sentencing memorandum it filed in Mr. Cortez's case itself.  Mr. Cortez's conduct was far more serious than that of Mr. Grayson.  Mr. Cortez first breached the Capitol through the Parliamentarian Door after which he joined a crowd chanting and facing off with police.  After being ushered out of  the building Mr. Cortez did not go home.  He instead moved to the North Doors, where he led a crowd

of rioters seeking entry.  Despite repeated orders by police standing just feet from him, Mr. Cortez

refused to back off.  He then led a group of rioters into the North Doors vestibule and for ten

minutes led rioters' efforts to prevent a group of officers from securing the doors, refusing to turn

back despite being sprayed in the face with pepper spray.  He led a second charge of the doors,

yelling "Hold our position!" to fellow rioters before trying to push through.  Mr. Cortez again

stepped in front of the crowd to address a group of officer attempting to retake their position and

regain control.  He yelled "Fuck you! And "Oath breakers!" and slammed a large flag pole on the



Mr. Cortez in a cloud of smoke leading a group of rioters into the North Doors vestibule



Mr. Cortez threatening officers while wielding flag pole

ground repeatedly.  Officers sprayed Cortez

with pepper spray, prompting him to scream, "Do it some fucking more! Do it some fucking

more!"  ECF No. 71.  This Court sentenced Mr. Cortez to 4 months imprisonment and 3 years of

supervised release to include 60 hours of community service.  ECF No. 78.

### E.    Need for Deterrence

Mr. Grayson is genuinely remorseful for entering the Capitol on January 6 and there is no

reason to believe he will ever reoffend.  In his letter to the Court he writes that entering the Capitol

was "an egregious error."[19]  He felt at the time that his conduct, taken at the behest of the sitting

President of the United States, was patriotic.  He writes, though, that "I know now that was a

mistake and again want you to know how regretful and sorry I am."  Finally, Mr. Grayson has no

---

[19] Letter of Kenneth Grayson, attached as Exhibit 1.

further interest in focusing on politics as part of his life and identity.  He writes:

> I have quit watching or paying attention to any type of politics. I am disgusted with and permanently off all social media. I am done caring or paying attention to any of the ongoing drama in our country. I will continue to focus on my daughter and parents. . . . . What I do believe is we should respect each other and find the common ground in each other. If you look hard enough I believe it is always there somewhere.

Mr. Grayson's family and friends all report that Mr. Grayson has expressed contrition and remorse for his acts.  His friend Kelly Pucci writes: "We all know that ken greatly regrets what he has done, and when you talk to him is with sorrow in his voice that if he could change it, he would. . . .

 I can truly say within my heart that I know that Ken will do better because I've already seen the change in him."[20]  As for general deterrence, sentencing Mr. Grayson to time in prison for entering the Capitol with the intent to delay the certification of the vote is not the salve that the country needs to ensure that January 6 was an isolated horror, particularly taking into account the cascade of consequences he has already faced for his conduct.  Empirical evidence proves that the certainty of prosecution, rather than the severity of punishment is the greater deterrent.[21]

## CONCLUSION

For the foregoing reasons and such others as may be presented at the sentencing hearing, the defense respectfully requests that the Court impose a sentence of probation with significant community service.  Unlike most January 6 defendants who engaged in comparable conduct, Mr. Grayson has here incurred a felony conviction, he has endured significant restrictions on his liberty for nearly two years, and he lost nearly everything he worked his entire life for after his arrest. Adding a prison term to this long list of consequences would result in a sentence that is greater than necessary to satisfy the goals of sentencing under 18 U.S.C. § 3553.

---

[20] Letter of Kelly Pucci, attached as Exhibit 2.
[21] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Ned Smock
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Ned_Smock@fd.org